**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2266-17T4

JOEL RIVERA,

      Plaintiff-Appellant,

v.

PNL JERSEY PROPERTIES,
LLC, and PNL COMPANIES,

      Defendants,

and

MILES SQUARE ROOFING,
CO., INC.,

      Defendant/Third-Party
      Plaintiff-Respondent,

v.

GUILIANO ENVIRONMENTAL,

      Third-Party Defendant.

_____

Submitted February 5, 2019 – Decided March 25, 2019

Before Judges Hoffman and Firko.

On appeal from Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-2146-15.

Pitts & Polizzi, LLP, attorneys for appellant (Dennis G. Polizzi, of counsel and on the briefs).

Oleske & Oleske, LLP, attorneys for respondent (Jerald F. Oleske, on the brief).

PER CURIAM

Plaintiff Joel Rivera, an employee of roofing subcontractor Guiliano Environmental (Guiliano), appeals from the Law Division order granting the summary judgment dismissal of his personal injury lawsuit against defendant Miles Square Roofing (MSR), the general contractor on the jobsite where plaintiff sustained severe injuries when he fell through a hole in the roof. We reverse.

I.

Because this appeal stems from a motion for summary judgment, we view the facts in a light most favorable to plaintiff as the non-moving party. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). In March 2013, PNL Jersey Properties (PNL) retained Sheldon Gross Realty, LLC (Gross) to serve as its management agent for a commercial building in Avenel, including contracting for all repairs or alterations to the building. In July 2013, Gross hired MSR to replace the roof on the building.

MSR's contract provided that PNL must approve all subcontractors and that MSR retained responsibility for "safety barriers . . . OSHA compliance, [and] safety compliances and procedures throughout the course of the work." MSR then hired Guiliano to remove the roof from PNL's building.[1] Plaintiff worked for Guiliano for "[a]bout two and a half years" before this accident.

Prior to bidding on the project, MSR conducted an inspection of the roof and discovered plywood sheets covering several holes in the roof. These plywood sheets appeared "as bumps in the roof." MSR knew the plywood patches posed safety concerns.

Based upon working with Guiliano on prior projects, MSR's project manager explained that an MSR foreman would mark a section of roof for Guiliano to rip up each night and MSR workers would replace that section of the roof the next work day. On July 16, 2013, plaintiff and other Guiliano workers arrived at PNL's building at 3:30 a.m., after working over eight hours at another job-site; by that time, other workers had already cut portions of the roof for removal. According to plaintiff, "We were only going to pick up the

---

[1] The record before us does not include a copy of the contract between MSR and Guiliano; however, it appears undisputed that Guiliano did not sign the contract until two days after plaintiff's accident.

A-2266-17T4

roof and clean." Flood lights provided illumination for Guiliano employees to do their removal work.

Within thirty minutes of his arrival, plaintiff fell twenty-five to thirty feet through an unguarded hole in the roof. According to plaintiff, he sustained a "traumatic brain injury, multiple skull based fractures, displaced fracture of the left superior pubic ramus, left sacroiliac fracture, severe low back injury" and related injuries. He remained in a coma for a week and a half, and his medical bills exceeded $265,000.

MSR did not have a foreman on site at the time of plaintiff's fall, contrary to its contract with PNL. Nor did MSR provide OSHA mandated equipment such as harnesses and guardrails, again in violation of its contract with PNL.[2]

After plaintiff's accident, MSR's operation manager learned that Guiliano workers had used "a rhino" on the roof and "[t]hat the deck was damaged by [the] rhino." He described a rhino as "basically a motorized wedge with agitat[ing] blade . . . used to pick the roofing up," after a roofer cuts the roof into sections. He further stated that MSR "never uses a rhino on a metal deck

---

[2] Guiliano also did not provide any safety equipment to plaintiff, not even a hardhat. Plaintiff did wear safety glasses, which he purchased himself.

roof." Following plaintiff's accident, he told Guiliano to discontinue using the rhino because of the damage it does to the roof, and Guiliano complied.

Guiliano previously performed subcontract work numerous times for MSR. According to MSR, in the prior instances, MSR "placed all responsibility for safety equipment, the means and methods of the roof removal work, and the supervision of employees of Guiliano engaged in the roof removal on [Guiliano]." The record contains no evidence that Guiliano ever provided safety equipment to its workers on the previous jobs for MSR. Instead, workers brought their own safety equipment, or worked without it.

OSHA regulations required various safety measures that were absent the day plaintiff fell. Employees working on surfaces more than six feet above ground must be "protected from falling through holes . . . by personal fall arrest systems, covers, or guardrail systems erected around such holes." 29 C.F.R. § 1926.501(b)(4)(i). Employers were also required to instruct employees to control hazards. 29 C.F.R. § 1926.21(b)(2). OSHA also required regular inspections by persons responsible for initiating and maintaining an accident prevention program. 29 C.F.R. § 1926.20(b)(2).

Both parties provided expert witness reports by the discovery end date, but plaintiff's report was served beyond the deadline established in a case

management order.  Along with its summary judgment motion, MSR moved to bar plaintiff's liability expert because it was served almost two months late. Plaintiff filed a cross-motion for summary judgment and for permission to utilize his liability expert, notwithstanding the late service of his report.  The court granted MSR's summary judgment motion and denied both sides' expert witness applications, apparently treating them as moot.

## II.

In a written statement of reasons granting MSR's motion for summary judgment, the motion judge rejected plaintiff's argument that MSR, as general contractor, breached its duty to maintain a safe workplace.  The judge found:

> [MSR] did not participate in this demolition work and did not exercise control over Guiliano's equipment, means and methods on the site.  [MSR] was not present at the time of plaintiff's injury, provided no equipment or assistance to Guiliano, [was] completely unaware of Guiliano's decision to permit plaintiff to remain on the roof without a harness.  Under the circumstances, [MSR] cannot under fairness and reasonableness grounds be said to have breached a duty to the plaintiff. It was proper for [MSR] to accept that after the exterior inspection of the rules by Guiliano[,] that Guiliano's management would notify its employees of the condition of the roof . . . .  Moreover, here [MSR] did not exercise sufficient supervisory oversight to render the injury foreseeable.

6

The judge acknowledged that MSR completed an inspection of the roof "before the work commenced and knew of holes or weakness in conditions on the roof due to layers of roof." She further noted plaintiff's argument that MSR "was contractually required to have a foreman on the site when Guiliano was working at night" and that the operations manager for MSR stated he would have stopped work if he saw Giuliano employees working on the roof without harnesses. Nevertheless, the judge found that Guiliano, not MSR, controlled the worksite. The judge further found that MSR's safety-related duties under his contract with PNL, and its own risk control policies, did not create a duty owing to plaintiff.

On appeal, plaintiff asserts that MSR breached a duty owed to plaintiff to provide a safe work environment.

## III.

We review the trial court's grant of summary judgment de novo. Lapidoth v. Telcordia Techs., Inc., 420 N.J. Super. 411, 417 (App. Div. 2011). We apply the same standard as the trial court. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div. 1998). We "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the

7

alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540. We review issues of law de novo. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Our analysis is guided by the principles adopted by the Court in Alloway v. Bradlees, Inc., 157 N.J. 221 (1999) and in Kane v. Hartz Mountain Indus., Inc., 143 N.J. 141 (1996), aff'g o.b., 278 N.J. Super. 129 (App. Div. 1994). We must determine whether MSR owed a duty to assure plaintiff's safety. Whether a duty is owed raises an issue of law for the court. Anderson v. Sammy Redd & Assocs., 278 N.J. Super. 50, 56 (App. Div. 1994).

In Kane, we held a general building contractor was liable to an employee of a steel framing subcontractor who fell from a steel beam. 278 N.J. Super. at 129. We relied in part on the employer's failure to install safety nets, which OSHA regulations required. Id. at 137. While we held violations of OSHA regulations do not establish negligence per se, "OSHA regulations are pertinent in determining the nature and extent of any duty of care." Id. at 142; Alloway, 157 N.J. at 236. Compliance with OSHA regulations does not preclude a finding of negligence, nor does non-compliance compel a finding of negligence. Alloway, 157 N.J. at 237.

A-2266-17T4

Along with considering OSHA standards, a trial court must weigh other factors relevant to the "determination of the existence of a duty of reasonable care under 'general negligence principles' . . . ." Id. at 230. This determination implicates consideration of the foreseeability of the risk of injury; the relationship of the parties; the nature of the attendant risk; the opportunity and ability to exercise care; and the public interest. Ibid.

Applying these standards, we find that MSR owed a duty of care to plaintiff as a matter of law. Initially, MSR assumed the duty to ensure OSHA and other safety standards were followed. MSR's contractual obligation to comply with OSHA's fall prevention standard favors imposition of a duty.

Further, the other factors addressed in Alloway also favor imposing upon MSR a duty of care owing to plaintiff. The risk of a fall through the roof was foreseeable. Here, defendant MSR had knowledge of plywood sheets covering holes in the roof. MSR's Vice President, Kirk Hollis, admitted he inspected the roof before bidding on the project and observed the holes in the roof his company needed to replace. The parties do not dispute this fact. Actual knowledge of a dangerous condition may be sufficient to find a duty. Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 576-77 (1996).

In Carvalho, knowledge of a dangerous condition resulted in a duty. The defendant's engineers were supervising a project during the course of which pipe was laid in trenches. Id. at 570, 575. One trench collapsed, killing the plaintiff. Id. at 572. The defendant's engineer had actual knowledge of the dangerous condition because he had learned that on the days prior, other trenches had collapsed. Id. at 574. The defendant's engineer, who was on site and could have addressed the problem, did not take adequate safety measures to negate risks of injury or death to workers on the site. See id. at 577-78. Thus, the defendants had actual knowledge of the risk of harm and the court imposed a duty.

Likewise here, defendant had actual knowledge of the dangerous condition after discovering the holes during its inspection of the roof. The parties do not dispute defendant's knowledge. Further, defendant had promised the building owner that it would exercise supervision over all of the roofing work and provide all required safety equipment.

As to the relationship between the contractor and subcontractor, although there is no evidence of common ownership, the record indicates Guiliano worked closely with MSR on numerous prior projects.

The nature of the risk also supports imposing a duty against MSR. Although the risk of falling is present in virtually any roof work, the risk in this

case arose from the nature of the worksite where the work was performed, and the absence of safety measures connected with that worksite. Plaintiff's risk did not arise out of the methods and means of removing old roofing material. Plaintiff was not injured by a tool provided by his employer. Cf. Tarabokia v. Structure Tone, 429 N.J. Super. 103 (App. Div. 2012) (holding general contractor was not liable to electrical subcontractor's employee for injury caused by use of subcontractor's power tool without proper safety gloves, and general contractor exerted no control over the use of the tool). Rather, plaintiff was injured because the roof where he worked was not made safe.

MSR also possessed the opportunity and ability to exercise care which could have avoided plaintiff's injury. Reducing the risk of a fall was within the general contractor's expertise or knowledge. MSR is a roofing specialist. Indeed, once Guiliano completed its work removing the old roof, MSR expected its own employees to mount the same roof, where they would face risks comparable to those plaintiff and his fellow Guiliano workers faced. At that point, MSR would have borne directly, for the sake of its own employees, the same duty to prevent falls that plaintiff seeks to impose for the sake of the subcontractor's employees.

MSR unquestionably had the opportunity and the authority to install fall prevention devices. The roofing contract between MSR and the building owner required MSR to exercise control over the site, to make it safe, and to prevent accidents. In the contract, MSR promised to supervise all work and provide all safety equipment necessary for the work.

The public interest supports imposing a duty of care upon MSR for plaintiff's benefit. We have held the "public policy of this State . . . favors the general contractor as the 'single repository of the responsibility for the safety of all employees of a job.'" Dawson v. Bunker Hill Plaza Assocs., 289 N.J. Super. 309, 321 (App. Div. 1996) (quoting Kane, 278 N.J. Super. at 141).

Further, although subcontractors generally have sufficient knowledge, training, and experience to understand the inherent risks in their line of work, see Tarabokia, 429 N.J. Super. at 213 ("[A] general contractor may assume that the independent contractor and [its] employees are sufficiently skilled to recognize the dangers associated with their task and adjust their methods accordingly to ensure their own safety.") (quoting Accardi v. Enviro-Pak Systems Co., Inc., 317 N.J. Super. 457, 463 (App. Div. 1999)). This is not dispositive.

MSR previously worked with plaintiff's employer on numerous prior occasions. According to plaintiff, Guiliano never provided any safety equipment. On the other hand, MSR contracted to provide all necessary safety equipment. While the contract is not dispositive, it would result in unfairness to allow MSR to promise to provide all required safety equipment only to use a company it regularly hired that never provided even bare minimum safety equipment to its workers, particularly when MSR knew of the dangerous conditions associated with the roof.

"[T]he paramount consideration of a worker's safety is more clearly placed in focus by a more comprehensive rule which makes the primary contractor and each tier of subcontractor responsible for the safety of the workers under them on general negligence principles." Kane, 278 N.J. Super. at 143. Finding MSR owed plaintiff a duty in this instance fully complies with this mandate. Therefore, we find MSR owed a duty to plaintiff.

Because the motion judge concluded this case was ripe for the entry of summary judgment in favor of MSR, she did not address the parties' applications concerning the late report of plaintiff's liability expert. Because we conclude it would likely benefit the jury to hear the testimony of an expert from each side in this case, and considering the catastrophic injuries sustained by plaintiff and

13

the absence of any prejudice to MSR by the late service of plaintiff's expert report, we conclude, in the interests of justice, that plaintiff should be permitted to utilize his liability expert at trial. On remand, the trial court shall reopen discovery for thirty days to permit counsel for MSR to depose plaintiff's expert.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2266-17T4